**Below are the Findings of Fact and Conclusions of Law of the Court.**

**Brian D. Lynch**
**U.S. Bankruptcy Judge**

(Dated as of Entered on Docket date above)

---

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF WASHINGTON AT TACOMA**

| | |
|---|---|
| In re:<br><br>CDC PROPERTIES I, LLC,<br><br><div align="center">Debtor.</div> | Case No. 11-41010-BDL |
| EQUITY FUNDING, LLC and<br>CENTRUM FINANCIAL SERVICES, INC.,<br><br><div align="center">Plaintiffs,</div><br><div align="center">v.</div><br><br>ERIC D. ORSE, et al.,<br><div align="center">Defendants.</div> | Adversary No. 18-04038-BDL<br><br>**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

The Court conducted a four-day trial for the remaining claims in this adversary proceeding commencing on October 15, 2019. The trial was a combined trial for this adversary proceeding and the adversary proceeding *MLMT 2005-MCP1 Washington Office Properties, LLC v. Orse et al. (In re CDC Properties I, LLC)*, Ch. 11 Case No. 11-41010-BDL, Adv. No. 18-04073-BDL (Bankr. W.D. Wash.). The Court combined the adversary

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW - 1

**Below are the Findings of Fact and Conclusions of Law of the Court.**

proceedings for trial because the claims raised in each adversary proceeding arose out of the same facts regarding the properties owned and debts owed by Debtor CDC Properties I, LLC ("CDC"). At the end of trial, the Court took the matters under advisement.

Plaintiffs Equity Funding, LLC ("Equity Funding") and Centrum Financial Services, Inc. ("Centrum") had the following remaining claims at the time of trial:

A) a negligent misrepresentation claim against Defendant Eric D. Orse;

B) a breach of contract claim against Defendant CDC based on alleged improper accounting and failure to comply with the Waterfall Provisions[1] in the CDC Plan;[2]

C) a breach of duty of good faith and fair dealing claim against CDC, to the extent such claim arises out of or relies on CDC's alleged improper accounting and failure to comply with the Waterfall Provisions in the CDC Plan;[3]

D) a negligence claim against Defendants Wells Fargo, N.A. as Trustee for the Registered Holders of Merrill Lynch Mortgage Trust 2005-MCP1 Commercial Mortgage Pass-Through Certificates, Series 2005-MCP1 ("Wells Fargo"); U.S. Bank, as Successor-Trustee to LaSalle Bank, N.A., as Trustee for the

---

[1] Except where otherwise noted, capitalized terms not defined herein shall have the meanings ascribed to them in the CDC Plan.

[2] Equity Funding alleged two bases for its breach of contract claim in Paragraph 4.18 of the Amended Complaint: (1) that CDC breached the CDC Plan when it sold the CDC Properties (defined below); and (2) that CDC failed to properly account for revenue and expenditures and to comply with the Waterfall Provisions in the CDC Plan. *See* ECF No. 68 at 22. The Court granted summary judgment in favor of CDC on the first basis for breach of contract on October 1, 2019. *See* ECF No. 161 at 3-6. Therefore, only the second basis for breach of contract remained at trial.

[3] The Court also granted summary judgment in favor of CDC on Equity Funding's claim for breach of duty of good faith and fair dealing to the extent that claim arose out of or relied on CDC's sale of the CDC Properties in violation of the CDC Plan. *See* ECF No. 161 at 7.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW - 2

**Below are the Findings of Fact and Conclusions of Law of the Court.**

benefit of the Certificate Holders of Commercial Mortgage Pass-

Through Certificates, Series MCCMT 2004-C2D ("U.S. Bank");

and Midland Loan Services, Inc., a division of PNC Bank, N.A.

("Midland", and together with Wells Fargo and U.S. Bank, the

"Bank Defendants");

E) a breach of contract claim against Wells Fargo and U.S. Bank;

and

F) a breach of duty of good faith and fair dealing claim against

Wells Fargo and U.S. Bank.

## I. JURISDICTION

"A bankruptcy court has jurisdiction over 'all civil proceedings arising under title 11, or arising in or related to cases under title 11.'" *Schultze v. Chandler*, 765 F.3d 945, 948 (9th Cir. 2014), *as amended* (Aug. 1, 2014); *see also* 28 U.S.C. §§ 157(a), 1334(b). "[C]laims that arise under or in [t]itle 11 are deemed to be 'core' proceedings, while claims that are related to [t]itle 11 are 'noncore' proceedings." *Maitland v. Mitchell (In re Harris Pine Mills)*, 44 F.3d 1431, 1435 (9th Cir. 1995). 28 U.S.C. § 157(b)(2) provides a non-exhaustive list of core proceedings.

"Congress gave bankruptcy courts the power to 'hear and determine' core proceedings and to 'enter appropriate orders and judgments,' subject to appellate review by the district court." *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1940 (2015); *see also* 28 U.S.C. § 157(b)(1). "But it gave bankruptcy courts more limited authority in non-core proceedings: They may 'hear and determine' such proceedings, and 'enter appropriate orders and judgments,' only 'with the consent of all the parties to the proceeding.'" *Wellness Int'l Network, Ltd.*, 135 S. Ct. at 1940; *see also* 28 U.S.C. § 157(c)(2). "Absent consent, bankruptcy courts in non-core proceedings may only 'submit proposed findings of fact and conclusions of law,'

**Below are the Findings of Fact and Conclusions of Law of the Court.**

which the district courts review *de novo*." *Wellness Int'l Network, Ltd.*, 135 S. Ct. at 1940; *see also* 28 U.S.C. § 157(c)(1).

The Bank Defendants do not consent to entry of final orders by this Court with respect to the claims in this adversary proceeding. ECF No. 106. Equity Funding, Orse, and CDC consent to entry of final orders or judgments by this Court with respect to all claims in this adversary proceeding. ECF No. 19 (Orse's consent and CDC's consent); ECF No. 33 (Equity Funding's first consent); ECF No. 105 (Equity Funding's second consent).

The Court concludes that the remaining claims in this adversary proceeding are related to title 11, and, therefore, are non-core proceedings. For post-confirmation non-core proceedings, the Ninth Circuit has adopted the "close nexus" test for jurisdiction, for which "the essential inquiry appears to be whether there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter." *Montana v. Goldin (In re Pegasus Gold Corp.)*, 394 F.3d 1189, 1194 (9th Cir. 2005) (quoting *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 166–67 (3d Cir. 2004)). "[M]atters affecting 'the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus.'" *Id.* (quoting *In re Resorts Int'l, Inc.*, 372 F.3d at 167)). Adjudication of these claims requires interpretation of the CDC Plan and, therefore, the Court has jurisdiction over these claims. However, because these claims are non-core proceedings and because the Bank Defendants do not consent to entry of final orders by this Court, the Court issues proposed findings of fact and conclusions of law, which are subject to the district court's de novo review in accordance with 28 U.S.C. § 157(c)(1) and Fed. R. Bankr. P. 9033.

## II. PRIOR RULINGS

Prior to commencement of the trial for this adversary proceeding, the Court entered the following orders that resulted in the dismissal or exclusion of claims:

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW - 4

**Below are the Findings of Fact and Conclusions of Law of the Court.**

- Order Granting Motion for Judgment on the Pleadings (ECF No. 54);[4]

- Order Granting in Part and Denying in Part Bank Defendants' Motion to Dismiss (ECF No. 74);[5]

- Order Granting in Part and Denying in Part [Orse] Defendants' Motion to Dismiss Amended Complaint (ECF No. 90);

- Order Granting in Part and Denying in Part Bank Defendants' Motion for Summary Judgment (ECF No. 108);[6]

- Order Granting in Part and Denying in Part Orse Defendants' Motion for Summary Judgment (ECF No. 160); and

- Order Granting in Part and Denying in Part CDC's Motion for Summary Judgment and/or Dismissal under Rule 12(b)(6) (ECF No. 161).

The Court also entered its Order Denying Plaintiff's Motion for Summary Judgment Against CDC (ECF No. 107) and Order Denying Plaintiffs' Motion for Partial Summary Judgment Against Defendant CDC (ECF No. 159); however, because these orders denied summary judgment, they did not result in the dismissal or exclusion of any claims. The Court also issued its Order on Plaintiffs' Motion re Right to a Jury Trial (ECF No. 139), ordering that the matter proceed as a bench trial.

Additionally, the Court entered several orders on evidentiary matters. Prior to trial, the Court entered its Order Denying Bank Defendants' Motion to Strike Equity Funding's Expert Report and Preclude Equity Funding from Introducing Expert Testimony at Trial (ECF No. 158), denying the Bank Defendants' motion with certain conditions. At the commencement of trial, the Court considered motions in limine filed by the Bank Defendants (ECF No. 167 and

---

[4] However, this order expressly granted Equity Funding leave to file an amended complaint within 15 days of entry of the order, which Equity Funding did. *See* ECF No. 68 (Amended Complaint).

[5] This order addressed the claims as pled in the original complaint. *See* ECF No. 74 at 4 n.1.

[6] The Court's oral ruling has been transcribed, and the transcript has been filed on the docket for this adversary proceeding under ECF No. 110.

**Below are the Findings of Fact and Conclusions of Law of the Court.**

170) and Orse and CDC (ECF No. 172). The Court read its oral rulings on the motions in limine into the record on October 15, 2019, and entered the following orders on October 22, 2019: (1) Order Granting in Part and Denying in Part Non-Bank Defendants' Motion in Limine and Objections to Exhibits (ECF No. 194); (2) Order Denying Bank Defendants' Motion in Limine to Exclude the Trial Testimony of Daniel Chun Pursuant to Fed. R. Civ. P. 26 and 37 (ECF No. 195); and (3) Order Denying Bank Defendants' Motion in Limine to Preclude Equity Funding from Introducing Certain Expert Testimony at Trial (ECF No. 196).

### III. PROPOSED FINDINGS OF FACT[7]

A.  <u>Background</u>

CDC is a wholly owned subsidiary of CDC Acquisition Company I LLC ("CDC Acquisition"), which is a single member LLC owned and controlled by Prium Companies, LLC ("Prium"). ECF No. 187 at 6:2-5 (Admitted Fact 1). MLMT 2005-MCP1 Washington Office Properties, LLC ("MLMT" or "Lender") was the senior secured creditor of CDC pursuant to two loans (the "Loans").[8] *See id.* at 6:7-12, 8:6-9 (Admitted Facts 2, 16). The Loans were secured by a valid and perfected first priority deed of trust (the "Deed of Trust")[9] on several commercial real properties located in the State of Washington that were owned by CDC at the time the Loans were issued (the "CDC Properties"). *Id.* at 6:5-6, 6:13-15 (Admitted Facts 1, 3). CDC

---

[7] To the extent any of the findings of fact are considered conclusions of law, they are adopted as such and vice versa.

[8] The original lenders for the Loans were Wells Fargo, N.A. as Trustee for Registered Holders of Merrill Lynch Mortgage Trust 2005-MCP1 Commercial Mortgage Pass-Through Certificates, Series 2005-MCP1 and LaSalle Bank, N.A., as Trustee for the benefit of the Certificate Holders of Commercial Mortgage Pass-Through Certificates, Series MCCMT 2004-C2D. Both acted by and through special servicer Midland. U.S. Bank, N.A. later became the successor-trustee to LaSalle Bank, N.A. The Loan held by Wells Fargo has been referred to as the "A Note," and the Loan held by U.S. Bank has been referred to as the "B Note." Both Loans have been transferred to MLMT.

[9] Although the parties have referred to the Deed of Trust as the plural "Deeds of Trust," only one deed of trust has been introduced into the record or referenced in the record. *See* MLMT Ex. 9 (Deed of Trust with Security Agreement, Assignment of Leases and Rents and Fixture Filing). Moreover, the Deed of Trust by its terms secures both the A Note and the B Note. *See id.* at 2. The Deed of Trust identifies Merrill Lynch Mortgage Lending, Inc. as the collateral agent for the holders of the A and B Notes, "and in such capacity, beneficiary" of the Deed of Trust.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW - 6

**Below are the Findings of Fact and Conclusions of Law of the Court.**

defaulted under the Loans and, on February 10, 2011, filed a chapter 11 bankruptcy case in this Court (the "CDC Bankruptcy Case"). *Id.* at 6:15-18 (Admitted Fact 4). On November 22, 2011, this Court issued an order confirming the CDC Plan of Reorganization (the "CDC Plan"). *Id.* at 6:18-19 (Admitted Fact 4). The CDC Bankruptcy Case was closed on February 15, 2012, but was subsequently reopened on December 14, 2016. *Id.* at 7:1-3 (Admitted Fact 7).

Equity Funding was a creditor of CDC with an allowed $6 million unsecured claim pursuant to the CDC Plan. *See* MLMT Ex. 11 at 13:16-24 (discussion of treatment of Classes 1 and 2).[10] Equity Funding was treated separately from the other unsecured claims that were placed in Class 5. *See id.* at 12:13-14, 12:26-13:5, 13:14-16:6, 17:18-25. The CDC Plan provided for certain payments, to the extent of available operating income, to Equity Funding as Classes 1 and 2 under the CDC Plan, which were to be made pursuant to the CDC Plan's Waterfall Provisions. ECF No. 187 at 7:3-5 (Admitted Fact 8). The payments were only to be made from available proceeds of the CDC Properties. *Id.* at 7:5-6 (Admitted Fact 8). Equity Funding was only entitled to payments after the following payments were made pursuant to the Waterfall Provisions: (a) taxes, insurance and operating expenses; (b) replacement and reletting reserve payments; (c) Wells Fargo debt payments; (d) U.S. Bank/LaSalle debt payments; (e) Class 5 Claims; (f) miscellaneous reserve payments; and (g) U.S. Bank/LaSalle unpaid interest "catchup" payments. *See* MLMT Ex. 11 at 18:1-19:9 (Waterfall Provisions of the CDC Plan). Equity Funding had the lowest priority in the Waterfall Provisions, aside from funds remaining with the Reorganized Debtor for its business purposes. *See id.*

The CDC Plan provided a schedule for payment of Equity Funding's claims (the "Subordinated Payment Schedule"). *See id.* at 14:17-15:8. The Subordinated Payment Schedule provided that Equity Funding was to receive $75,000 on the first Anniversary Date if funds were available. *See id.* at 14:20-21. Section II of the CDC Plan defined the first

---

[10] The Bank Defendants' exhibits are referred to herein as "MLMT Ex. ___." The exhibits of Orse and CDC are referred to herein as "Orse Ex. ___." Equity Funding's exhibits are referred to herein as "Equity Ex. ___."

**Below are the Findings of Fact and Conclusions of Law of the Court.**

1  Anniversary Date as one calendar year after the Confirmation Date; thus, the first Anniversary

2  Date was November 22, 2012. *See id.* at 8:24-9:2. The Subordinated Payment Schedule

3  provided for additional payments to Equity Funding on the second, third, fourth, and fifth

4  Anniversary Dates. *See id.* at 14:22-15:4. Payments under the Subordinated Payment

5  Schedule were expressly subject to the availability of funds after compliance with the Waterfall

6  Provisions:

7  
8  
9  
> Nothing in the foregoing Subordinated Payment Schedule shall obligate Midland to disburse to the Reorganized Debtor (or any other person) funds from the accounts described in the Cash Management Agreement until such time as the items described in the Waterfall Provisions (a) through (g) have been paid in full.

10  *Id.* at 15:5-8. Equity Funding did not receive a payment on the first Anniversary Date or any

11  subsequent Anniversary Date.

12       The terms of the CDC Plan imposed obligations on CDC to manage the CDC

13  Properties, manage the operating expenses of the CDC Properties, maintain the reserve

14  accounts, and make the payments required by the CDC Plan. *See id.* at 19:23-20:5. However,

15  the terms of the CDC Plan required continued compliance with the Cash Management

16  Agreement contained in the Deed of Trust, which gave the Bank Defendants undivided power

17  to manage and control the revenue from the CDC Properties. *See id.* at 18:2-3 ("The

18  Reorganized Debtor will continue to comply with the Cash Management Agreement currently

19  in place . . . ."); MLMT Ex. 9 at 58-66 (Art. V of the Deed of Trust). Thus, all of the operating

20  income of CDC was under the control of loan servicer Midland, which not only serviced the

21  Loans, but was also responsible for managing the income pursuant to the Cash Management

22  Agreement. *See* MLMT Ex. 9 at 58-66 (Art. V of the Deed of Trust). Midland was responsible

23  for making disbursements to the escrow account established by CDC to hold funds for

24  payment of Equity Funding's claims in accordance with the Subordinated Payment Schedule;

25  however, Midland was not obligated to make such disbursements "until such time as the items

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW - 8

**Below are the Findings of Fact and Conclusions of Law of the Court.**

described in Waterfall Provisions (a) through (g) below have been paid in full." *See* MLMT Ex. 11 at 13:25-15:8.

On October 2, 2013, Eric D. Orse was appointed as the chapter 11 trustee of the consolidated bankruptcy estates of Hyun J. Um, Jin S. Um, Thomas W. Price, and Patricia A. Price in this Court (the "Price/Um Bankruptcy Case"). *See* ECF No. 187 at 5:24-6:1, 7:7-9 (Admitted Facts 1, 9). Mr. Price and Mr. Um owned controlling membership interests in a large number of LLCs, including Prium. In two management orders entered in the Price/Um Bankruptcy Case, the Court ratified Orse's authority to manage various entities controlled by Price and Um, including Prium and its subsidiaries, which included CDC Acquisition and CDC. *See id.* at 7:9-12 (Admitted Fact 10).

On August 15, 2014, Orse commenced a voluntary chapter 11 bankruptcy for Prium in this Court (the "Prium Bankruptcy Case"). *Id.* at 7:13-15 (Admitted Fact 11). By orders dated October 2, 2014 and February 27, 2015, the Court ratified Orse's management authority over Prium's lower tiered subsidiaries that he had previously exercised in his capacity as trustee of the Price/Um Bankruptcy Case. *See id.* at 7:15-18 (Admitted Fact 12). As the management representative for the member-owner of CDC, Orse's responsibility was to the owners of CDC, CDC Acquisition and ultimately Prium.

After confirmation of the CDC Plan, CDC defaulted on the Loans when there was insufficient cash to make certain required payments thereunder. *Id.* at 6:25-26 (Admitted Fact 6). On March 11, 2016, MLMT commenced nonjudicial foreclosure proceedings with respect to the CDC Properties. *Id.* at 8:9-11 (Admitted Fact 17). On May 4, 2016, MLMT filed a petition in Washington state court and obtained an Order Appointing Custodial Receiver over the CDC Properties. *Id.* at 8:12-15 (Admitted Fact 18). On May 13, 2016, Orse notified Equity Funding of the petition to appoint a receiver. *Id.* at 8:15-17 (Admitted Fact 19).

**Below are the Findings of Fact and Conclusions of Law of the Court.**

On or about July 1, 2016, MLMT served, and subsequently recorded, Notices of Trustee's Sales with respect to the CDC Properties (the "Notices of Sale"). *Id.* at 8:18-19 (Admitted Fact 20). Pursuant to the Notices of Sale, nonjudicial foreclosure sales of the CDC Properties were scheduled for October 21, 2016. *Id.* at 8:19-21 (Admitted Fact 20). On August 9, 2016, Orse notified Equity Funding of the Notices of Sale. *See* MLMT Ex. 47.

On August 3, 2018, after multiple bankruptcies by the purchasers of the CDC Properties and extensive litigation, the CDC Properties were sold at nonjudicial foreclosure sales to MLMT via credit bid, nearly two years after the foreclosure sale of the CDC Properties was originally scheduled. *See* ECF No. 187 at 11:1-22 (Admitted Facts 35-40). Equity Funding did not bid at the public foreclosure sales of the CDC Properties. *Id.* at 11:20-22 (Admitted Fact 40).

Throughout the above events, Midland retained complete control of revenues derived from the CDC Properties under the Cash Management Agreement in the Deed of Trust. *See* MLMT Ex. 9 at 58-66 (Art. V of the Deed of Trust). Aside from the Moses Lake property that was sold during certain bankruptcy proceedings in the Bankruptcy Court for the Eastern District of New York, MLMT continues to own and control the CDC Properties and has only marketed the West Seattle property.

Equity Funding filed its original complaint in this adversary proceeding on June 8, 2018. *See* ECF No. 1.

B.    Accounting and Compliance with the Waterfall Provisions

The parties dispute whether the Bank Defendants properly accounted for revenue and expenditures and complied with the Waterfall Provisions in the CDC Plan. The Bank Defendants called an expert witness, Neal Gluckman, at trial, and his expert report and rebuttal report were admitted into the record as MLMT Ex. 48 and MLMT Ex. 59. Mr. Gluckman testified, and the Court agrees, that the entries in the waterfall analyses were

**Below are the Findings of Fact and Conclusions of Law of the Court.**

consistent with the Waterfall Provisions in the CDC Plan and that the entries in the waterfall analyses were consistent with the underlying supporting documentation, including bank statements, escrow histories, and other analyses prepared and provided by the Bank Defendants. *See also* MLMT Ex. 48 at 3 (listing the documents reviewed by Mr. Gluckman in connection with his analysis). While there were some timing differences between the bank activity waterfall analysis and the book activity waterfall analysis, the entries evened out over the period of analysis, and the total transactions for both documents were the same.

The bank activity waterfall analysis was provided as Exhibit 2 of Mr. Gluckman's expert report. *See id.* at 7, 12-19. The book activity waterfall analysis was provided as Exhibit 3 of Mr. Gluckman's export report. *See id.* at 7, 20-22. Mr. Gluckman's expert report also provided two other exhibits: Exhibit 4, which "shows the funds available (deficit) for the LaSalle claims for 2013, 2014, and 2015," and Exhibit 5, which "shows the Pro Forma Adjusted Balance calculation for 2013, 2014, and 2015." *See id.* at 9-10, 23-24. They all support MLMT's position that there were insufficient funds to pay Equity Funding under the Waterfall Provisions in the CDC Plan.

Starting in 2013, there were insufficient funds to make the U.S. Bank/LaSalle unpaid interest "catchup" payments under paragraph (g) of the Waterfall Provisions. By Summer 2013, there were insufficient funds to make the U.S. Bank/LaSalle debt payments under paragraph (d) of the Waterfall Provisions. Consistent with his testimony, Mr. Gluckman's expert report states "[a]s shown on Exhibits 2 and 3, there were insufficient funds derived from the Waterfall available to pay the LaSalle claims at least as of July 31, 2013." *Id.* at 9. Plaintiffs were unable to show the existence of funds available to pay Equity Funding after payment of the higher priority claims pursuant to the Waterfall Provisions.

**Below are the Findings of Fact and Conclusions of Law of the Court.**

Mr. Gluckman also discussed the additional analysis he conducted after reviewing the expert report of Kento Nakajima.[11] He testified that after reviewing Mr. Nakajima's report, he realized that some of the payments made in 2013 that he thought were for 2012, were actually for 2013. When Mr. Gluckman made the corresponding adjustments, it reduced the negative amounts in the righthand column of Exhibit 5 of his expert report, the "Pro Forma Adjusted Ending Balance to Pay Other Claims," but did not change his underlying conclusions. The amounts in the righthand column of Exhibit 5 were still negative, just less negative.

During cross-examination, Equity Funding's counsel questioned Mr. Gluckman regarding certain payments made to Green Johnny LLC for repair services. While Equity Funding raised questions about the payments made to Green Johnny LLC, Equity Funding did not present sufficient evidence to prove the payments were duplicative or improperly paid, nor did Equity Funding show that even if such payments were duplicative or improper, it would have materially changed the availability of funds to pay Equity Funding under the CDC Plan's Waterfall Provisions.

Equity Funding argued there were funds in the Miscellaneous Reserve Account available for payments that were not used to make payments. Equity Funding's counsel referred to proceeds from a sale of one of the CDC Properties, a property in Chehalis, Washington that sold pre-petition in 2006. However, a prepayment on the Loans from the Chehalis sale proceeds in 2006 would have triggered the yield maintenance provision in the Deed of Trust. *See* MLMT Ex. 9 at 85-88 (Art. XV of the Deed of Trust). The yield maintenance provision was effectively a prepayment penalty, which would have consumed most of the approximately $617,000 in proceeds from the Chehalis sale. Instead, CDC and Bank Defendants agreed to put the proceeds from the Chehalis sale in the Miscellaneous

---

[11] As discussed below, Kento Nakajima is the expert witness Equity Funding indicated it intended to have testify at trial. Mr. Nakajima was not called to testify at trial, nor was his expert report introduced into evidence by Equity Funding.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW - 12

**Below are the Findings of Fact and Conclusions of Law of the Court.**

Reserve Account and apply the proceeds to the Loans after the yield maintenance provision expired in July 2014. In July 2014, the funds were applied to the principal balance of the A Note. *See* MLMT Ex. 51 at 109.

The Waterfall Provisions in the CDC Plan state that CDC will make payments from available operating income. *See* MLMT Ex. 11 at 18:1-5. The Chehalis proceeds were not available operating income. The language of the CDC Plan is clear:

> The Reorganized Debtor will continue to comply with the Cash Management Agreement currently in place and will make payments (including creditor payments required by this Plan) ***from available operating income from the Real Property*** in accordance with the following "Waterfall Provisions": . . . .

*Id.* (emphasis added). "Operating Income" is defined in the Deed of Trust, which under the terms of the CDC Plan, continues to control the Wells Fargo Claim under Class 3 and the LaSalle Bank Claim under Class 4, except as otherwise provided in the CDC Plan. *See id.* at 16:8-9, 17:1-2. The definition of "Operating Income" expressly excludes "proceeds of any sale, exchange or transfer of the Property or any part thereof or interest therein. . . ." MLMT Ex. 9 at 19. The proceeds from the sale of the Chehalis property retained their status as collateral of the Loans and were not available to pay other creditors, including Equity Funding, under the Waterfall Provisions of the CDC Plan. *See id.* at 6 (including proceeds within the definition of "Property").

Equity Funding also raised the issue of whether the default interest and default penalties were improperly assessed by Midland, arguing that Midland caused the default by its faulty accounting. The only expert testimony on this issue came from Mr. Gluckman, who testified that his analysis reflected in Exhibit 5 of his expert report did not include any default interest, late charges, or late payments, or additional contract interest or other interest or other charges based on the timing of payments. Mr. Gluckman testified that, based on his review of the waterfall analyses and analyses prepared by Midland, those analyses did not add any

**Below are the Findings of Fact and Conclusions of Law of the Court.**

default interest, late charges, or late payments, or additional contract interest based on the timing of payments.

Mr. Gluckman's testimony was essentially unrefuted. Equity Funding indicated in the Amended Joint Pretrial Order (ECF No. 187) that it intended to call Kento Nakajima as its expert witness for the accounting issues. However, counsel for Equity Funding informed the Court during trial that it would not be calling Mr. Nakajima. Equity Funding did not seek to introduce Mr. Nakajima's expert report into evidence at trial. Equity Funding did not produce expert evidence to address the propriety of the accounting or compliance with the Waterfall Provisions.

Equity Funding has not put forward sufficient evidence to establish that the Bank Defendants failed to properly account for revenue and expenditures or failed to comply with the Waterfall Provisions in the CDC Plan. While Equity Funding has raised suspicions about the accounting, including the timing of payments and payments to vendors, it has not provided evidence of material errors and has been unable to produce a basis under which Equity Funding would have been entitled to payment under the Waterfall Provisions of the CDC Plan. There were insufficient funds to pay Equity Funding's claims because Equity Funding's claims were subordinate to the seven other claims that were first entitled to available funds. *See* MLMT Ex. 11 at 18:1-19:7.

The funds to be paid to Equity Funding were to be deposited by Midland into an escrow account maintained by CDC for distribution to Equity Funding, pending resolution of Equity Funding's dispute with Bingo Investments, LLC. *See id.* at 14:3-13. However, because there were never sufficient funds to pay Equity Funding under the Waterfall Provisions of the CDC Plan, Midland made no such deposit. Consequently, the funds were never available to CDC to distribute to Equity Funding.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW - 14

**Below are the Findings of Fact and Conclusions of Law of the Court.**

C.  Equity Funding's Knowledge of the Bank Defendants' Alleged Improper Accounting and Noncompliance with the Waterfall Provisions for Purposes of the Bank Defendants' Statute of Limitations Defense

On November 26, 2013, Equity Funding, through its then-counsel Edwin Sato, sent a letter to CDC, providing notice of CDC's default under the CDC Plan. *See* Orse Ex. 103 at 4 (admitted into evidence as an attachment to a June 9, 2014 email from Edwin Sato to David Neu, then-counsel for the Bank Defendants). In the November 26, 2013 letter, Equity Funding expressed concerns regarding the propriety of CDC's accounting that resulted in no payments to Equity Funding under the Waterfall Provisions and Subordinated Payment Schedule. *See id.*

By June 2014, Equity Funding had shifted its focus to the Bank Defendants. A June 9, 2014 email from Edwin Sato to David Neu indicates Equity Funding had made inquiries to CDC, and by extension the Bank Defendants, to receive accounting information regarding payments under the Waterfall Provisions and the alleged default. *See* Orse Ex. 103 at 1-2. The email also indicates Equity Funding was aware that the state of performance under the Waterfall Provisions would impact its prospects for payment of its claims under the CDC Plan. See *id.*

A January 2, 2015 letter from David Neu to Equity Funding's current counsel, Rick Wathen, addressed several questions Mr. Wathen had posed in a December 12, 2014 email. *See* Equity Ex. 45 at. 1. The questions concerned "accounting information provided by [Midland] regarding the loans to [CDC]." *Id.* The letter indicates Equity Funding was provided with four spreadsheets: one detailing the activity in the bank account and three detailing how the available cash was applied pursuant to the Waterfall Provisions in the CDC Plan. *See id.* at 2. The letter is over three pages long. *See id.* at 1-4. The stamp on the first page of the

**Below are the Findings of Fact and Conclusions of Law of the Court.**

letter shows it was received by Cole, Wathen, Leid, & Hall, P.C. on January 5, 2015. *See id.* at 1.

Derek Edmonds, the CEO of Centrum, which is the managing member and sole owner of Equity Funding, testified during the trial that he expected to see substantial payments by the second Anniversary Date. When asked whether the November 26, 2013 letter was an acknowledgement that Equity Funding knew that the money was not where it was supposed to be, he responded yes. Mr. Edmonds further testified that Equity Funding really started to contact CDC in early 2014 to see why funds had not been placed in escrow. Edmonds was told there were no funds available under the Waterfall Provisions, so he asked for accounting information. He testified that it took nine months to receive the information. When asked who he made this request of, he responded that he made the request of David Neu.

The Court finds that Equity Funding knew or should have known of the facts that would form the basis for its negligence claim against the Bank Defendants by January 5, 2015.

D.   Communications Between Orse, Equity Funding, and the Bank Defendants Relating to Orse's Alleged Misrepresentations

Orse and Equity Funding, through Derek Edmonds, were in communication regarding CDC, directly or through counsel, throughout the period after Orse took over management of CDC until MLMT scheduled the nonjudicial foreclosure sales in 2016. They dealt with each other because Equity Funding was hoping that the CDC Properties might somehow produce sufficient income to pay off Equity Funding, and Orse in turn hoped that there might be some value in the CDC Properties for the Prium estate after Equity Funding was paid off. Orse requested accounting documents, and had difficulty obtaining information from the Bank Defendants regarding their calculations. In particular, there was delay in getting bank statements from Midland because Midland had to request the information from PNC Bank,

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW - 16

**Below are the Findings of Fact and Conclusions of Law of the Court.**

N.A.[12] Orse was dubious of the Bank Defendants' accounting and whether the Bank Defendants properly declared a default that resulted in substantial default interest accruing on the Loans. He was never comfortable with whether there were funds available to make the payments on the Loans and the catchup payments to the Bank Defendants under the CDC Plan, but he also never completed an analysis to conclude otherwise. He hoped to somehow reach an agreement with the Bank Defendants about a reduced payoff. He expressed this doubt and hope to Edmonds, who was hoping that Orse would be able to obtain concessions from the Bank Defendants.

At trial, counsel for Equity Funding pointed to the "CDC Portfolio Estimated Summary Valuation" prepared by Kidder Mathews that Orse forwarded to Edmonds on March 10, 2015. *See* MLMT Ex. 33 (email correspondence from Orse to Edmonds, attaching the Estimated Summary Valuation). The Estimated Summary Valuation indicated a possible value of $43,636,261 as of December 2014. *See id.* at 4. Orse provided Edmonds with the Estimated Summary Valuation, but made no independent representation of value. *See id.* at 1. Edmonds testified that Orse did not tell him not to rely on the Estimated Summary Valuation. Orse testified that he forwarded the Estimated Summary Valuation to Edmonds because they were trying to determine how to restructure the CDC portfolio.

Email discussions with Midland's attorney David Neu regarding the accounting produced some minor adjustments to the loan history by Midland, but discussions with the Bank Defendants and their attorneys never resulted in any significant concession by the Bank Defendants regarding what was owed or the existence of a default for purposes of the calculation of default interest. In the summer of 2015, Orse began also exploring the possibility of a debt restructure with the Bank Defendants.

---

[12] Midland is a division of PNC Bank, N.A.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW - 17

**Below are the Findings of Fact and Conclusions of Law of the Court.**

Along the way, Edmonds and Orse explored agreements whereby there might be a basis for Prium to recover some proceeds from the CDC Properties before Equity Funding was paid in full, but it is clear they never reached an agreement. Edmonds made overtures to Orse in June 2015 about acquiring the CDC membership interests, with suggestions for sharing some of the net recoveries with CDC. *See* Orse Ex. 72. Specifically, the offer provided that "[i]n exchange for Centrum receiving an assignment of the membership interests in CDC . . . , Centrum will have the option to either 1) pay $500K to the Estate as a lump sum payment in the future, or 2) pay 20% of all future net recoveries to the Estate, up to $1.2MM following full recovery of $6MM." *Id.* at 1. Orse did not accept this offer because the choice of which option was left to Edmonds' discretion.

In August 2015, CDC proposed a workout arrangement to the Bank Defendants. *See* Orse Ex. 76 at 4. The Bank Defendants responded, and Orse forwarded the response letter to Edmonds. *See id.* at 1. Edmonds responded to Orse, stating in part "[t]heir response looks like a non-starter to me at first glance." *Id.* In 2016, Edmonds, through Upside Management, LLC, offered to purchase certain of the CDC Properties as well. *See* Orse Ex. 108. However, the offers were contingent on lender and court approval, and the Bank Defendants did not consent. *See id.* at 14, 29, 44. The only property that was sold between 2013 and the transfer of the CDC Properties in Fall 2016 was the property in Wenatchee, Washington, which was sold to a third party in early 2016.

Orse asked his attorneys to prepare a complaint against the Bank Defendants regarding the accounting in Spring 2016, but ultimately determined not to bring an action. The reasons given by Orse and his attorneys were the statements made by the Court to Prium's other counsel, Cairncross & Hempelmann, at a hearing on May 4, 2016. At that hearing, the Court expressed concern that, given the claims in the Prium case (over $300 million), the total funds in the estate (approximately $3 million), and the additional attorney fees that would be

**Below are the Findings of Fact and Conclusions of Law of the Court.**

incurred, the litigation contemplated would likely not produce much additional recovery for creditors. *See* Orse Ex. 99. Orse himself conceded at trial that obtaining accountings can be expensive ventures. Other factors affected Orse's consideration, including the fact the tenants for two of the CDC Properties' leases were not renewing, which would affect both the revenue stream and the value of the CDC Properties.

Equity Funding was advised of the Notices of Sale and the receiver petition. *See* ECF No. 187 at 8:15-17 (Admitted Fact 19); MLMT Ex. 47. But Equity Funding never took action itself, even though it would have been the primary, if not sole, beneficiary of an action challenging the accounting and default declaration. Equity Funding, through Edmonds, was kept well aware of Orse's discussions with the Bank Defendants and their attorneys. Edmonds is a sophisticated "hard money lender" well familiar with commercial real estate lending. He chose not to take any action on his own to challenge the foreclosure by the Bank Defendants.

Edmonds' failure to take action was not a function of reasonable reliance on Orse's statements. Rather, it reflected his own desire not to incur fees and expenses in an uncertain challenge of the default declaration. It was about hope that Orse might carry the dispute, not reliance. His testimony that Orse's production of the Estimated Summary Valuation from Kidder Mathews was somehow a representation is not credible. It was not a representation by Orse, nor was it something that he reasonably relied on. His statement that he did not take action because he relied on Orse pursuing discussions with the Bank Defendants is not credible and not reasonable. And it is belied by the fact that even after he became aware that Orse was not going to pursue an action disputing the accounting or attempting to stop the foreclosure, he took no action. Orse's determination not to sue the Bank Defendants was prudent given that the Prium estate's pursuit of the Bank Defendants would have been high risk, expensive, and of very uncertain reward.

**Below are the Findings of Fact and Conclusions of Law of the Court.**

Indeed, one of the most probative comments in the record came from an email from Edmonds to Orse in June 2015, where Edmonds stated he was aware that two of the CDC Properties would be going dark in the coming few months, which would "no doubt lead to the inability of the portfolio to continue servicing the first mortgage, mak[ing] this a precarious situation with a speculative value that fast approaches zero as each day goes by." Orse Ex. 72 at 1.

The cause of Equity Funding's loss was not Orse or his counsel. It was a function of the simple lack of revenue from or equity in the CDC Properties and Equity Funding's own inaction in response to the default declarations and the foreclosure by the Bank Defendants.

## IV. PROPOSED CONCLUSIONS OF LAW[13]

A. <u>Negligent Misrepresentation Claim Against Orse</u>[14]

"A plaintiff claiming negligent misrepresentation must prove by clear, cogent, and convincing evidence that (1) the defendant supplied information for the guidance of others in their business transactions that was false, (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in his business transactions, (3) the defendant was negligent in obtaining or communicating the false information, (4) the plaintiff relied on the false information, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff damages." *Ross v. Kirner*, 162 Wn.2d 493, 499, 172 P.3d 701 (2007). "An omission alone cannot constitute negligent misrepresentation, since

---

[13] Equity Funding's claims against Orse, CDC, and the Bank Defendants arise under state law; therefore, the Court relies on Washington state law and federal courts' consideration of Washington state law in its proposed conclusions of law.

[14] Plaintiffs did not separately plead a cause of action for negligent misrepresentation against Orse in the Amended Complaint, aside from pleading that he had a duty to disclose truthful, accurate and material information to Equity Funding within their negligence claim. *See* ECF No. 68 at 30. Nevertheless, Equity Funding and Orse have treated the Amended Complaint's allegations as pleading a negligent misrepresentation claim, both in their pleadings for dispositive motions and in their Amended Joint Pretrial Order. *See* ECF No. 128 at 5-14; ECF No. 145 at 12-24; ECF No. 149 at 2-8; ECF No. 187 at 12.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW - 20

**Below are the Findings of Fact and Conclusions of Law of the Court.**

the plaintiff must justifiably rely on a misrepresentation." *Id.* "Moreover, the plaintiff must not have been negligent in relying on the representation." *Id.* at 500.

The facts presented at trial reflect not a case of negligent misrepresentation, but instead a case of inaction by Equity Funding and deals that never came to fruition. Orse pursued investigation of the accounting issues to the extent it would have been beneficial for the Prium creditors' recovery. Because the Bank Defendants did not consent to Equity Funding's offers, it would have been futile to submit them to the Court for approval, as the lender approval had not been given. Orse notified Equity Funding that he had received notice that there was a foreclosure sale scheduled for October 21, 2016, *see* MLMT Ex. 47, yet Equity Funding took no action to stop the foreclosure.

Plaintiff has failed to prove any of the elements of its negligent misrepresentation claim by clear, cogent, and convincing evidence. Accordingly, the Court concludes that Orse did not make actionable negligent misrepresentations to Equity Funding.

B.   Breach of Contract Claim Against CDC for Improper Accounting and Failure to Comply with the CDC Plan Waterfall Provisions

"A breach of contract claim depends on proof of four elements: duty, breach, causation, and damages." *BP W. Coast Prods. LLC v. SKR Inc.*, 989 F. Supp. 2d 1109, 1121 (W.D. Wash. 2013) (citing *Baldwin v. Silver*, 165 Wn. App. 463, 473, 269 P.3d 284 (2011)). "Washington follows the 'objective manifestation' theory of contracts, determining the parties' intent by focusing on the objective manifestations in their contract rather than on the parties' unexpressed subjective intentions." *Peterson v. Kitsap Cmty. Fed. Credit Union*, 171 Wn. App. 404, 430, 287 P.3d 27 (2012). "When construing a written contract, [Washington courts] apply the following principles: (1) The parties' intent controls, (2) the court ascertains their intent from reading the contract as a whole, and (3) the court will not read ambiguity into a contract that is otherwise clear and unambiguous." *Id.*

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW - 21

**Below are the Findings of Fact and Conclusions of Law of the Court.**

Under the CDC Plan, all revenues from the CDC Properties were deposited in an account under the exclusive control of Midland, which was responsible for administering the account. Midland was also responsible for disbursing to the escrow account any funds that were to be distributed under the Subordinated Payment Schedule, but only to the extent such funds were available after the claims described in Waterfall Provisions (a) through (g) of the CDC Plan were paid in full. Equity Funding was only entitled to payments under the CDC Plan from available operating income after the following payments were made pursuant to the CDC Plan's Waterfall Provisions: (a) taxes, insurance and operating expenses; (b) replacement and reletting reserve payments; (c) Wells Fargo debt payments; (d) U.S. Bank/LaSalle debt payments; (e) Class 5 Claims; (f) miscellaneous reserve payments; and (g) U.S. Bank/LaSalle unpaid interest "catchup" payments. Equity Funding failed to prove there were sufficient funds to pay Equity Funding's claims. Equity Funding's claims were subordinate to the claims discussed above, and some of those claims were not being paid from available operating income as required under the CDC Plan.

At trial, Equity Funding asserted the CDC Plan entitled Equity Funding to payment from funds in the Miscellaneous Reserve Account, citing the definition of Reserve Accounts in Section II of the CDC Plan, *see* MLMT Ex. 11 at 12:9-10, and the source of plan payments provision in Section VI of the CDC Plan, *see id.* at 19:10-14. Equity Funding referenced the proceeds from the sale of the Chehalis property in 2006, which were held in the Miscellaneous Reserve Account pursuant to an agreement between CDC and the Bank Defendants until the yield maintenance provision in the Deed of Trust terminated.

Section VI is a general plan provision addressing the source of plan payments. It states:

> The funds necessary to make the payments required by the Plan will come from the Reorganized Debtor's cash on hand on the Effective Date, the Reserve Accounts, and the Rents received after the Effective Date. Nothing in this Plan shall be interpreted as

**Below are the Findings of Fact and Conclusions of Law of the Court.**

requiring the Debtor to make Plan payments from any other source.

*Id.* at 19:10-14. The CDC Plan provides for certain payments to be made from the Miscellaneous Reserve Account; however, none of those payments were to be made to Equity Funding. *See id.* at 16:12-15, 18-19 (payments for the Wells Fargo Claim); *id.* at 17:11-12 (payments for the U.S. Bank/LaSalle Claim). The CDC Plan's specific provisions make clear that the only source for payments to Equity Funding was available operating excess cash flow from the operating income from the CDC Properties. See *id.* at 13:25-14:2 ("The Reorganized Debtor's obligation to pay this amount will be . . . subject to the Waterfall Provisions and Subordinated Payment Schedule below, satisfied from the excess cash flow generated by the Real Property."); *id.* at 18:1-5 ("The Reorganized Debtor . . . will make payments . . . from available operating income from the Real Property in accordance with the following 'Waterfall Provisions': . . . . "); *id.* at 19:3-7 ("From available operating cash flow after payment of the foregoing items, . . . ."). As previously discussed, the definition of "Operating Income" in the Deed of Trust expressly excludes proceeds from the sale of the CDC Properties. *See* MLMT Ex. 9 at 19.

When interpreting contracts, "the specific prevails over the general." *T-Mobile USA Inc. v. Selective Ins. Co. of Am.*, 450 P.3d 150, 155 (Wash. 2019); *see also Adler v. Fred Lind Manor*, 153 Wn.2d 331, 354, 103 P.3d 773 (2004) ("It is a well-known principle of contract interpretation that 'specific terms and exact terms are given greater weight than general language.'"); *Diamond "B" Constructors, Inc. v. Granite Falls Sch. Dist.*, 117 Wn. App. 157, 165, 70 P.3d 966 (2003) ("Where the contract provides a general and a specific term, the specific controls over the general."). The specific provisions of the CDC Plan, which limit the source of payments for Equity Funding's claims, prevail over the general provision in Section

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW - 23

**Below are the Findings of Fact and Conclusions of Law of the Court.**

VI of the CDC Plan. Therefore, the Court concludes Equity Funding was not entitled to payment of its claims from any funds in the Miscellaneous Reserve Account.

Moreover, the Chehalis sale proceeds were held as additional collateral for the Loans both under the terms of the Deed of Trust and the agreement between CDC and the Bank Defendants. Those proceeds were not available cash flow from which Equity Funding could be paid. Pursuant to the agreement of the parties, when the yield maintenance provision in the Deed of Trust terminated, the proceeds were applied to the balance of the A Note. Lastly, Equity Funding failed to demonstrate that even if the proceeds from the Chehalis property in the Miscellaneous Reserve Account were available to pay claims under the Waterfall Provisions of the CDC Plan, that the funds would have gone to Equity Funding, as opposed to higher priority claims under the Waterfall Provisions.

Further, the August 2018 foreclosure of the CDC Properties effectively terminated any further payment obligation owed to Equity Funding under the CDC Plan, as the CDC Properties were the only remaining source of payments to pay Equity Funding under the terms of the CDC Plan. *See* MLMT Ex. 11 at 13:25-14:2 (CDC Plan ¶ V.b) ("The Reorganized Debtor's obligation to pay this amount will be . . . iv) subject to the Waterfall Provisions and Subordinated Payment Schedule below, satisfied from the excess cash flow generated by the Real Property.").

Accordingly, the Court concludes Equity Funding has failed to meet its burden and has not proven that CDC breached the CDC Plan, nor that it was damaged by the alleged breach.

C.    Breach of Duty of Good Faith and Fair Dealing Claim Against CDC

Every contract in Washington has an implied duty of good faith and fair dealing that requires contract parties to "perform in good faith the obligations imposed by their agreement." *Badgett v. Sec. State Bank*, 116 Wn.2d 563, 569, 807 P.2d 356 (1991). "[T]he duty arises only in connection with terms agreed to by the parties." *Id.* "[T]he duty of good faith does not

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW - 24

**Below are the Findings of Fact and Conclusions of Law of the Court.**

extend to obligate a party to accept a material change in the terms of its contract." *Id.* "Nor does it 'inject substantive terms into the parties' contract.'" *Id.*

As discussed above, CDC complied with the Waterfall Provisions of the CDC Plan. There were never funds available to pay Equity Funding pursuant to the Waterfall Provisions; therefore, no such payments were due, and CDC never received funds from Midland for distribution to Equity Funding. CDC did not breach the duty of good faith and fair dealing because it complied with the Waterfall Provisions in the CDC Plan.

Plaintiffs' breach of duty of good faith and fair dealing claim against CDC fails because Plaintiffs cannot identify any contractual or other obligation that was breached by CDC. Accordingly, the Court concludes that Equity Funding has failed to meet its burden and has not proven that CDC violated the duty of good faith and fair dealing with respect to the CDC Plan.

D.   Negligence Claim Against the Bank Defendants

"In an action for negligence a plaintiff must prove four basic elements: (1) the existence of a duty, (2) breach of that duty, (3) resulting injury, and (4) proximate cause." *Degel v. Majestic Mobile Manor, Inc.*, 129 Wn.2d 43, 48, 914 P.2d 728 (1996). The Bank Defendants argued in their trial brief that Equity Funding's negligence claim is barred by the applicable statute of limitations. *See* ECF No. 162 at 25-26. The Bank Defendants also argued that the negligence claim is baseless, as the Bank Defendants did not breach any duty, and Equity Funding was not able to prove its negligence claim. *See id.* at 26-27. The Court considers the statute of limitations argument first and the merits of the negligence claim second.

"In Washington, negligence claims are subject to a three-year statute of limitations." *Banks v. Pac. Mar. Ass'n*, No. C13-1008RSL, 2014 WL 3689765, at *2 (W.D. Wash. July 24, 2014); *see also* RCW 4.16.080(2). The complaint in this adversary proceeding was filed on

**Below are the Findings of Fact and Conclusions of Law of the Court.**

June 8, 2018. Therefore, the question is whether Equity Funding's negligence claim against the Bank Defendants accrued before June 8, 2015.

"The general rule in ordinary personal injury actions is that a cause of action accrues at the time the act or omission occurs. *In re Estates of Hibbard*, 118 Wn.2d 737, 744, 826 P.2d 690 (1992). However, "[i]n certain torts, . . . injured parties do not, or cannot, know they have been injured; in [those] cases, a cause of action accrues at the time the plaintiff knew or should have known all of the essential elements of the cause of action.' This is an exception to the general rule and is known as the 'discovery rule.'" *Id.* at 744-45 (quoting *White v. Johns-Manville Corp.*, 103 Wn.2d 344, 348, 693 P.2d 687 (1985)). "Application of the rule is limited to claims in which the plaintiffs could not have immediately known of their injuries due to professional malpractice, occupational diseases, self-reporting or concealment of information by the defendant." *Id.* at 749-50. "Application of the rule is extended to claims in which plaintiffs could not immediately know of the cause of their injuries." *Id.* at 750.

"The discovery rule requires a plaintiff to use due diligence in discovering the basis for the cause of action." *Allen v. State*, 118 Wn.2d 753, 758, 826 P.2d 200 (1992); *see also Killian v. Seattle Pub. Sch.*, 189 Wn.2d 447, 454-55, 403 P.3d 58 (2017). "The cause of action will accrue on the date that the plaintiff, through exercise of due diligence, should have discovered the basis for the cause of action, even if actual discovery did not occur until later." *Killian*, 189 Wn.2d at 455. "The key consideration under the discovery rule is the factual, not the legal, basis for the cause of action." *Allen*, 118 Wn.2d at 758. "The action accrues when the plaintiff knows or should know the relevant facts, whether or not the plaintiff also knows that these facts are enough to establish a legal cause of action." *Id.*

Equity Funding's negligence claim against the Bank Defendants accrued no later than January 5, 2015, when Equity Funding's counsel received the letter from David Neu addressing various questions Equity Funding had posed regarding the accounting information

**Below are the Findings of Fact and Conclusions of Law of the Court.**

Midland had provided. By January 5, 2015, Equity Funding had (1) not received payments pursuant to the CDC Plan; (2) raised with counsel for the Bank Defendants that it had concerns regarding the accounting and the impact thereof on its payments; (3) received certain accounting information from Midland; (4) posed additional questions to Midland's counsel regarding the accounting information; and (5) received responses to those questions. Because Equity Funding's negligence claim accrued no later than January 5, 2015 and Equity Funding did not file its complaint until June 8, 2018, Equity Funding's negligence claim against the Bank Defendants is time-barred.

Even if Equity Funding's negligence claim against the Bank Defendants were timely, Equity Funding would not prevail on the merits because it has not met its burden of proof with respect to the elements of the negligence claim: duty, breach, damages, and causation. As discussed below, the Bank Defendants complied with the Waterfall Provisions of the CDC Plan by paying the subordinated claims in the order designated out of available funds. Equity Funding has not shown a breach occurred. Equity Funding has also not established it was damaged by the Bank Defendants' actions. Equity Funding's claims were deeply subordinated to seven other claims under the CDC Plan and, as discussed above, the source of payments for Equity Funding's claims was limited. Moreover, Equity Funding was not able to produce evidence at trial to provide a basis under which Equity Funding would have been owed payment under the Waterfall Provisions of the CDC Plan.

Accordingly, the Court concludes that Equity Funding has failed to meet its burden and has not proven that the Bank Defendants were negligent in their administration of payments under the CDC Plan.

E.    Breach of Contract Claim Against Wells Fargo and U.S. Bank

"A breach of contract claim depends on proof of four elements: duty, breach, causation, and damages." *BP W. Coast Prods. LLC*, 989 F. Supp. 2d at 1121 (citing *Baldwin*, 165 Wn.

**Below are the Findings of Fact and Conclusions of Law of the Court.**

App. at 473). "Washington follows the 'objective manifestation' theory of contracts, determining the parties' intent by focusing on the objective manifestations in their contract rather than on the parties' unexpressed subjective intentions." *Peterson*, 171 Wn. App. at 430. "When construing a written contract, [Washington courts] apply the following principles: (1) The parties' intent controls, (2) the court ascertains their intent from reading the contract as a whole, and (3) the court will not read ambiguity into a contract that is otherwise clear and unambiguous." *Id.*

Equity Funding's breach of contract claim is predicated on Wells Fargo and U.S. Bank, through their loan servicer Midland, failing to make any payments to Equity Funding as a creditor of CDC, thereby allegedly violating the Waterfall Provisions of the CDC Plan. As discussed above, Equity Funding's claims were deeply subordinated to seven other claims under the CDC Plan, and the Bank Defendants complied with the Waterfall Provisions of the CDC Plan by paying the subordinated claims in the order designated out of available funds from available operating income. Equity Funding failed to prove that there were funds available from operating income from the CDC Properties to pay Equity Funding after the payments to the other, higher priority claims. Equity Funding has not shown a breach occurred.

Because there were no funds available to pay Equity Funding's claims in accordance with the Waterfall Provisions, Equity Funding was not paid. Notwithstanding Equity Funding not receiving any payments under the CDC Plan, Wells Fargo and U.S. Bank complied with the Waterfall Provisions by paying the claims in the order designated by those provisions.

Moreover, the August 2018 foreclosure of the CDC Properties effectively terminated any further payment obligation owed to Equity Funding under the CDC Plan, as the income from the CDC Properties was the only remaining source of payments to Equity Funding under the terms of the CDC Plan. *See* MLMT Ex. 11 at 13:25-14:2 (CDC Plan ¶ V.b) ("The

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW - 28

**Below are the Findings of Fact and Conclusions of Law of the Court.**

Reorganized Debtor's obligation to pay this amount will be . . . iv) subject to the Waterfall Provisions and Subordinated Payment Schedule below, satisfied from the excess cash flow generated by the Real Property.").

Accordingly, the Court concludes that Equity Funding has failed to meet its burden and has not proven that Wells Fargo and U.S. Bank breached the CDC Plan.

F.    Breach of Duty of Good Faith and Fair Dealing Claim Against Wells Fargo and U.S. Bank

Every contract in Washington has an implied duty of good faith and fair dealing that requires that contract parties "perform in good faith the obligations imposed by their agreement." *Badgett*, 116 Wn.2d at 569. "[T]he duty arises only in connection with terms agreed to by the parties." *Id.* "[T]he duty of good faith does not extend to obligate a party to accept a material change in the terms of its contract." *Id.* "Nor does it 'inject substantive terms into the parties' contract.'" *Id.*

As discussed above, Wells Fargo and U.S. Bank complied with the Waterfall Provisions of the CDC Plan by paying the subordinated claims in the order designated out of available funds. Wells Fargo and U.S. Bank did not breach the duty of good faith and fair dealing because they performed a specific provision of the CDC Plan by paying the subordinated claims in the order designated by the Waterfall Provisions. Accordingly, the Court concludes that Equity Funding has failed to meet its burden and has not proven that Wells Fargo and U.S. Bank violated the duty of good faith and fair dealing with respect to the CDC Plan.

G.    The Proceeds from the Transfer of the CDC Properties to Pilevsky Group

At trial, the Court *sua sponte* raised a question about what the parties proposed to do with the $100,000 in proceeds from the sale of the CDC Properties, which is held in Karr Tuttle Campell's trust account. Equity Funding briefly addressed the issue in its trial brief, but the issue has not been briefed in detail by the parties in the adversary proceedings. The

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW - 29

**Below are the Findings of Fact and Conclusions of Law of the Court.**

parties stated at trial their notions regarding who was entitled to the funds, but legal argument was not presented. Inasmuch as who will be entitled to the funds depends to a large extent on whether the Court's rulings are upheld by the district court, the Court will refrain from ruling on the issue and set a further hearing on the issue after final orders are entered in the adversary proceedings.

## V. CONCLUSION

Equity Funding has failed to satisfy its burden of proof for all of its remaining claims. Moreover, Equity Funding's negligence claim against the Bank Defendants is time-barred by the statute of limitations. As discussed above, the Court's findings of fact and conclusions of law for these claims are proposed findings of fact and conclusions of law for submission to the district court pursuant to 28 U.S.C. § 157(c)(1). "[A]ny final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

Pursuant to 28 U.S.C. § 157(c)(1) and Fed. R. Bankr. P. 9033, the parties shall have fourteen (14) days from service of these proposed findings of fact and conclusions of law to file and serve written objections. *See* Fed. R. Bankr. P. 9033(b). Failure to file objections may result in a waiver of those objections for purposes of de novo review by the district court.

///END OF PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW///

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW - 30